Charles E. **CALLAHAN,** Appellant–Defendant,

v.

**STATE of Indiana,** Appellee–Plaintiff.

No. 82A01–9904–CR–128.

Court of Appeals of Indiana.

Nov. 17, 1999.

David M. Shaw, Evansville, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Michael McLaughlin, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

ROBB, Judge

Charles Callahan was found guilty by a jury of dealing in marijuana in excess of ten pounds, a Class C felony. He now appeals his conviction. We affirm.

### Issues

Callahan raises two issues for our review, which we restate as follows:

1. Whether the trial court properly denied his motion to suppress evidence discovered during a search of his automobile by a drug interdiction officer who had stopped him for a minor traffic offense; and

2. Whether the trial court properly allowed him to proceed *pro se* at his trial.

### Facts and Procedural History [1]

The facts most favorable to the verdict are that on April 15, 1997, Evansville City Police Officers Hahn and Pierce stopped Callahan because the vehicle he was driving had improperly tinted windows and a Texas license plate which appeared to have expired in 1994. Officer Hahn issued a "warning" ticket to Callahan for the window violation. At that time, Officer Hahn testified, Callahan was free to go.

Officer Hahn, however, asked Callahan if he would like to step out of the car and stretch his legs because he appeared to have been driving for some time. Callahan exited the vehicle and he and Officer Hahn engaged in conversation, during the course of which Officer Hahn informed Callahan that he was a drug interdiction officer traveling with a canine unit. Officer Hahn testified that he told Callahan he did not have to cooperate, and asked if he could look inside the vehicle for weapons and narcotics. Callahan said, "You can search the inside of my car as much as you like." R. 76. In searching the inside of the vehicle, Officer Hahn discovered a film canister containing what appeared to be marijuana. Officer Hahn then retrieved his canine unit. The dog alerted to the scent of narcotics at the rear of the vehicle. Officer Hahn asked Callahan if he could look at the spare tire carrier under the rear of the car, near where the dog had alerted. Callahan agreed. When Officer Hahn removed the carrier, he found eight bricks of what was ultimately determined to be over thirteen pounds of marijuana. Callahan was then placed under arrest.

Callahan was charged with dealing in marijuana as a Class C felony in violation of Indiana Code section 35–48–4–10. John Clouse and John Brinson were retained by Callahan to represent him, but he later discharged them. Dennis Brinkmeyer then entered his appearance on behalf of Callahan.

Brinkmeyer filed a motion to suppress on Callahan's behalf, seeking to suppress the fruits of the vehicle search, alleging that the search was pretextual, was conducted without probable cause, and was non-consensual. Officer Hahn testified at the hearing that after he gave Callahan a warning ticket, he continued to talk with Callahan and obtained his consent to search the car. Upon finding a small

---

1. Oral argument was heard on this case on October 19, 1999, at Indiana State University in Terre Haute, Indiana.

amount of marijuana in the car, Officer Hahn obtained Callahan's consent to getting his dog out to "search" the vehicle. When the dog "alerted" near the rear of the car, Officer Hahn obtained Callahan's permission to look under the car, where he found in excess of thirteen pounds of marijuana hidden in the spare tire. After a hearing, the trial court denied the motion.

A jury trial on this charge was scheduled for May 18, 1998. On the morning the trial was to begin, Callahan requested leave to discharge Brinkmeyer and represent himself. The trial court conducted an inquiry and ultimately determined that the request was untimely. The trial proceeded with Brinkmeyer representing Callahan. However, because the jury was allowed to view an exhibit which had not been admitted into evidence, a mistrial was declared.

After the mistrial was declared, Brinkmeyer was allowed to withdraw his appearance, and David Shaw was appointed to represent Callahan over Callahan's objection. Callahan's trial was reset for August 31, 1998. On July 31, 1998, Callahan appeared in court and again requested that he be allowed to proceed without counsel. Shaw was then relieved of his duties as appointed counsel, but was asked to attend the trial and serve as stand-by counsel. The August 31, 1998, trial ended with a hung jury.

Callahan's third trial, at which he represented himself with Shaw as stand-by counsel, began November 16, 1998, and ended with a guilty verdict. Callahan was sentenced to four years at the Indiana Department of Correction. Shaw has prosecuted this appeal on Callahan's behalf.

*Discussion and Decision*

I. Denial of Motion to Suppress

Prior to trial, Callahan filed a motion to suppress evidence seized as a result of the search of his car, specifically, the thirteen pounds of marijuana found in the spare tire carrier.[2] Callahan contends that the trial court's denial of this motion was in error.

*A. Standard of Review*

▮▮▮ We initially note our standard of review when reviewing a trial court's ruling on the validity of a search and seizure: we consider the evidence most favorable to the ruling and any uncontradicted evidence to the contrary to determine whether there is sufficient evidence to support the ruling. *Melton v. State*, 705 N.E.2d 564, 566 (Ind.Ct.App.1999). If the evidence is conflicting, we consider only the evidence favorable to the ruling and will affirm if the ruling is supported by substantial evidence of probative value. *Id.*

▮▮▮ Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. In cases involving a warrantless search, the State bears the burden of proving an exception to the warrant requirement. *State v. Farber*, 677 N.E.2d 1111, 1116 (Ind.Ct.App.1997), *trans. denied.* A valid consent to search is an exception to the warrant requirement. *Id.* The theory underlying this exception is that, when an individual gives the State permission to search either his person or property, the governmental intrusion is presumably reasonable. *See Jones v. State*, 655 N.E.2d 49, 54 (Ind.1995).

*B. Consent to Search*

During the course of a lawful stop to investigate a traffic violation, Callahan

**2.** Although not raised in its brief, the State argued at oral argument that Callahan has waived this issue for failure to properly preserve it with a timely and specific objection at trial. Callahan, representing himself at trial, did object to the admission of the marijuana and other evidence discovered during the search of his car. R. 208, 211, 311. Although the objections were somewhat general in nature, incorporating by reference earlier objections and arguments thereon, we believe they were sufficient to preserve this issue for our review. We will therefore review Callahan's contentions on their merits.

consented to the search of his car. Callahan concedes that the initial stop was lawful and that his subsequent consent to the search was objectively voluntary; however, he takes issue with the practice of drug interdiction officers watching for minor traffic offenses with the actual motive of uncovering a drug or weapons violation during the course of the traffic stop. Accordingly, he contends that his consent was not subjectively voluntary and that his Article I, section 11 privacy right under the Indiana Constitution was infringed by the officer's request that he give consent without either a specific advisement of the right to refuse consent or independent reasonable suspicion of some additional illegal activity.

### 1. Totality of the Circumstances Test

■ When the State seeks to rely upon consent to justify a warrantless search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. *Thurman v. State*, 602 N.E.2d 548, 552 (Ind.Ct.App.1992), *trans. denied.* The voluntariness of a consent to search is a question of fact to be determined from the totality of the circumstances. *Id.* A consent to search is valid except where it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law. *Id.* To constitute a valid waiver of Fourth Amendment rights, a consent must be the intelligent relinquishment of a known right or privilege. *Id.* (quoting *United States v. Payne*, 429 F.2d 169 (9th Cir.1970)). Such a waiver cannot be conclusively presumed from a verbal expression of assent unless the court determines, from the totality of the circumstances, that the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the officers a license which the person knows may be freely and effectively withheld. *Id.* Knowledge of the right to refuse a search is one factor which indicates voluntariness. *Id.*

■ The "totality of the circumstances" from which the voluntariness of a detainee's consent is to be determined includes, but is not limited to, the following considerations: (1) whether the defendant was advised of his *Miranda* rights prior to the request to search; (2) the defendant's degree of education and intelligence; (3) whether the defendant was advised of his right not to consent; (4) whether the detainee has previous encounters with law enforcement; (5) whether the officer made any express or implied claims of authority to search without consent; (6) whether the officer was engaged in any illegal action prior to the request; (7) whether the defendant was cooperative previously; and (8) whether the officer was deceptive as to his true identity or the purpose of the search. *State v. Scheibelhut*, 673 N.E.2d 821, 824 (Ind.Ct.App.1996).

■ The evidence most favorable to the trial court's ruling indicates that Officer Hahn did not place Callahan under arrest or restrain his liberty in any way until after he discovered the marijuana in the spare tire carrier. R. 94. Accordingly, Callahan was not advised of his *Miranda* rights prior to the search. R. 74–75. Officer Hahn observed that Callahan seemed to be a person of normal intelligence, and did not appear to be under the influence of drugs or alcohol. R. 86–87. After Officer Hahn gave Callahan a warning ticket for the tinted windows violation, Hahn told him he was free to go. R. 85. Callahan did not immediately leave, however, and during the ensuing conversation, Hahn told Callahan that he wanted to look inside the vehicle. R. 74. He told Callahan that he did not have to cooperate, but stated that Callahan was "100 percent cooperative from start to finish." R. 74. Callahan told Officer Hahn that he could "search the inside of [his] car as much as [he] like[d]." R. 76. Officer Hahn clearly told Callahan that he was a drug interdiction officer and that his purpose was to stem the transport of illegal narcotics on our roadways by watching for traffic violations. R. 87. Officer Hahn told Callahan each time he wished to escalate the search

(i.e. from looking inside the car to getting the dog out to looking under the car to removing the spare tire carrier) and Callahan consented each time. R. 87, 88–89, 92, 93. At any time prior to the discovery of the large amount of marijuana in the spare tire carrier, Callahan was free to get in his car and drive away without repercussion. R. 94. This is sufficient indicia under the totality of the circumstances test to indicate that Callahan's consent to the search of his car was voluntarily given.

### 2. Advisement of Right to Refuse Consent

Callahan contends that unless a detainee is specifically advised that he has the right to refuse consent to a search, any consent he may give is not truly voluntary. He therefore suggests that, akin to requiring *Miranda* warnings, we adopt a bright-line constitutional requirement that a detainee be specifically advised that he is under no obligation to answer any questions or consent to a search before his consent could be considered to have waived his Article I, section 11 right against unreasonable search and seizure.

In *State v. Scheibelhut*, this court considered whether a consent to search is involuntary and thus invalid on the sole basis that a person was not informed of his right to refuse consent. 673 N.E.2d at 822. The facts of *Scheibelhut* are similar to those here: the defendant was stopped for driving in excess of the speed limit with a broken taillight. After the officer had checked the defendant's driver's license and registration and returned those items to the defendant, the stop was "basically finished." *Id.* However, the officer decided to ask permission to search the vehicle for illegal drugs or weapons because there was at that time a "severe problem with criminal mischiefs [sic] in the area involving pellet guns." *Id.* The defendant agreed and advised the officer when asked that there was a pellet gun under the front seat. The officer found the pellet gun and also marijuana. The

defendant was arrested and charged with possession of marijuana. He filed a motion to suppress alleging that he had not given valid consent to the search because he was not informed that he had the right to refuse permission. The trial court granted the defendant's motion to suppress solely because of the "lack of warning to the Defendant that he had a right to refuse...." *Id.* at 823. This court reversed because the trial court's statement made it clear that it had not considered the totality of the circumstances; but rather had considered only the single circumstance of lack of knowledge of the right to refuse.

The United States Supreme Court has rejected a similar *per se* rule under the Fourth Amendment that before a consent may be deemed voluntary, the detainee must be advised that he is free to go. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). Our state supreme court, however, has distinguished between Article I, Section 11 of the Indiana Constitution and the Fourth Amendment on the question of warrantless searches of automobiles. *See Brown v. State*, 653 N.E.2d 77, 79 (Ind.1995). A violation of the federal protection against unreasonable searches and seizures occurs when evidence is admitted from a search that "neither possesses judicial sanction nor falls into one of the exceptions to the warrant requirement." *Id.* Rather than employing federal constitutional concepts such as the warrant requirement and probable cause, our supreme court has enunciated a separate and distinct method of analyzing claims of state constitutional search and seizure violations: the State bears the burden of showing that, in the totality of the circumstances, the intrusion was reasonable. *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind.1999).

It is not clear whether the defendant in *Scheibelhut* raised a specific claim under the Indiana Constitution. The *Scheibelhut* court merely noted that it found no cases "supporting the proposition that our su-

preme court would hold that the Indiana Constitution goes beyond the federal Constitution to impose a bright-line requirement that voluntary consent requires an advisement of the right to refuse consent to search." 673 N.E.2d at 824 n. 1. Callahan has arguably made such a state constitutional claim in this regard; however, we find it unnecessary to address his cursory contention. Officer Hahn testified that after he gave Callahan the warning ticket, he told Callahan he was free to go and he did not have to cooperate further. Thus, whether or not our state constitution could be said to impose such a requirement, the specific advisements which Callahan advocates were in fact given to him.

### 3. Independent Reasonable Suspicion

Callahan also contends that Article I, section 11 should be interpreted to require independent reasonable suspicion of some illegal activity apart from the traffic stop in order for an officer to even seek consent to search. He argues that even though the initial stop was reasonable, Officer Hahn's continued contact with him after the purpose of the stop was completed was unreasonable without such independent reasonable suspicion of illegal activity.

Indiana Code section 34–28–5–3 states that an officer may detain a person who he in good faith believes has committed an infraction or ordinance violation for a time sufficient to inform him of the allegation, obtain his name, address, and date of birth or his driver's license, and allow him to execute a notice to appear. Driving with improperly tinted windows is a Class C infraction. Ind.Code §§ 9–19–19–4, –7. Thus, Officer Hahn was clearly entitled to detain Callahan for a time sufficient to complete the purpose of the traffic stop.

It has been repeatedly held by courts of this state that a lawful traffic stop, even if pretextual, does not convert the stop into an unreasonable search and seizure. *See Kenner v. State,* 703 N.E.2d 1122, 1126 n. 1 (Ind.Ct.App.1999), *trans. denied; State v. Voit,* 679 N.E.2d 1360, 1363 (Ind.Ct.App. 1997); *State v. Hollins,* 672 N.E.2d 427, 431 (Ind.Ct.App.1996), *trans. denied. See also Whren v. United States,* 517 U.S. 806, 812, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (stating that "not only have we never held, outside the context of an inventory search ..., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary.").

An examination of each of the cases cited above, however, demonstrates the difference between them and the case at issue. In *Kenner,* an officer had been informed that a red Camaro and a tan Chevrolet appeared to have been traveling together and passing each other at excessive rates of speed. The officer spotted the red Camaro, determined it to be traveling ten miles per hour over the speed limit, and initiated a traffic stop. When the defendant exited the car at the officer's request, the officer smelled what he believed to be marijuana. The officer asked if there were any illegal drugs in the car, and the defendant responded not to his knowledge. The officer then asked consent to search the car, which the defendant denied because the car was not his. The officer called for a canine unit, and told the defendant he was free to leave but the car had to remain. The canine unit alerted for the presence of drugs, and the subsequent search uncovered twelve pounds of marijuana. The defendant was charged with possession of marijuana and dealing in marijuana. 703 N.E.2d at 1124–25. This court affirmed the trial court's denial of defendant's motion to suppress. *Id.* at 1128.

In *Voit,* officers were requested to be on the lookout for a burgundy Chevrolet, the driver of which was suspected of drug activity. The officers spotted the vehicle, paced it at ten miles per hour over the speed limit, and initiated a traffic stop. When the officers approached the car, they detected a faint odor of alcohol. The defendant denied drinking or having any open containers when asked. The officers

requested consent for a search, which the defendant gave. While one officer searched the car, the other stood outside the car with the defendant. He asked her if she had any weapons, which she denied. When the defendant opened her purse for examination, the officer observed the tops of plastic bags and asked what was in the bags. The defendant attempted to flee, but was apprehended and placed under arrest for resisting law enforcement. A subsequent search of her purse revealed that the plastic bags contained marijuana and cocaine. 679 N.E.2d at 1361. This court reversed the trial court's grant of defendant's motion to suppress. *Id.* at 1363.

Finally, in *Hollins,* a drug interdiction team monitoring a house where drug activity was suspected observed the defendant enter the house twice and leave a short time later each time. The second time he left, he was carrying a clear plastic bag. The team broadcast a description of the defendant, his automobile and his direction of travel. Two officers spotted defendant's vehicle, followed him, and pulled him over after he failed to signal a right hand turn. When the officers approached the vehicle, they observed a clear plastic bag containing a white powder wedged in the passenger seat. When the officers removed the bag, a film canister containing rocks of crack cocaine came out with it. 672 N.E.2d at 429. This court reversed the trial court's grant of defendant's motion to suppress. *Id.* at 433.

The key difference between these cases and the case at issue is that in each of the cited cases, although a search by some means followed an otherwise valid traffic stop, the officers did in fact have some independent reasonable suspicion of illegal activity. In this case, there are no articulable facts upon which to base a reasonable suspicion that Callahan was involved in illegal activity prior to the drug interdiction officer's request for consent to a search. Officer Hahn himself testified at the motion to suppress hearing that "I didn't have any reason to believe that he's committing a crime at the time. He was free to go when I gave him the warning ticket." R. 73. However, Officer Hahn's singular purpose was to watch for minor traffic offenses and try to ferret out drug or weapons violations during the course of the stop, and thus he sought consent for a search.

Callahan ostensibly raises the state constitutional argument but fails to provide an independent analysis of Article I, section 11, instead arguing solely that several other states have adopted such a restriction on the ability to seek consent to search at the conclusion of an otherwise routine traffic stop and urging that as a policy matter we, too, adopt such a requirement. *See State v. Toevs,* 327 Or. 525, 964 P.2d 1007, 1011 (1998) (holding, pursuant to state statute which prescribes any further action during a stop for a traffic infraction other than that "reasonably related" to the infraction, identification and issuance of a citation, that defendant's motion to suppress drugs found in a search following a traffic stop for driving without headlights on should have been granted); *State v. Retherford,* 93 Ohio App.3d 586, 639 N.E.2d 498, 507–08 (1994) (holding that "an officer may not expand the investigative scope of the detention beyond that which is reasonably necessary to effectuate the purposes of the initial stop unless any new or expanded investigation is supported by a reasonable, articulable suspicion that some further criminal activity is afoot."). *See also United States v. Walden,* 146 F.3d 487, 490 (7th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999) (holding that "when there is reasonable suspicion that the occupants of a vehicle are engaged in *other* illegal activity, an officer may *prolong* a traffic stop to investigate that activity.") (emphasis added); *Valance v. Wisel,* 110 F.3d 1269, 1276–77 (7th Cir.1997) (holding that a lawful traffic stop did not develop into an unreasonable seizure after the purpose of the stop was completed because

the officers' observation of a handgun on the floorboard constituted reasonable suspicion to support continued detention).

Although we, too, are troubled by the increasingly common practice of police stopping vehicles for minor traffic offenses and seeking consent to search with no suspicion whatsoever of illegal contraband, all in the name of the war on drugs, we are unwilling under the facts of this case to say that our state constitution prohibits police from doing so. Callahan clearly and voluntarily consented to the search of his vehicle even after being told that he was free to go and that he did not have to cooperate with the officer. Thus, the State met its burden of proving an exception to the warrant requirement which rendered an otherwise unreasonable search presumably reasonable. The trial court did not err in denying Callahan's motion to suppress.

## II. Waiver of Right to Counsel

Callahan contends that his waiver of the right to counsel was not knowingly, voluntarily, and intelligently made because the trial court's advisement against self-representation was both untimely and inadequate. He contends the advisement was untimely because he was advised on May 18, 1998, two and one-half months before he was allowed to represent himself at trial, about the perils of self-representation and was not re-advised thereafter. He contends the advisement was inadequate because it did not include each of the specific advisements recommended by *Dowell v. State*, 557 N.E.2d 1063 (Ind.Ct.App. 1990), *trans. denied, cert. denied*, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). Callahan specifically complains that he was not advised that self-representation is almost always unwise.

### A. Standard of Review

The Sixth Amendment to the United States Constitution and Article I, section 13 of the Indiana Constitution guarantee a criminal defendant the right to appointed counsel. This right may be waived if it is done so knowingly, intelli-

gently, and voluntarily. *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Hagy v. State*, 639 N.E.2d 693, 694 (Ind.Ct.App.1994). Thus, when a criminal defendant waives his right to counsel and elects to proceed *pro se*, we must decide whether the trial court properly determined that the defendant's waiver was knowing, intelligent, and voluntary. *Greer v. State*, 690 N.E.2d 1214, 1216 (Ind. Ct.App.1998), *trans. denied*. When the right of self-representation is properly asserted by a clear and unequivocal request made within a reasonable time prior to trial, the trial court must conduct a hearing to determine the defendant's competency to represent himself and also to establish a record of the waiver. *Dowell*, 557 N.E.2d at 1066. The record must show that the defendant was advised of the nature, extent and importance of the right to counsel and the necessary consequences of waiving that right. *Greer*, 690 N.E.2d at 1216. Even in the absence of specific inquiries into the educational background of the defendant, the defendant's familiarity with legal procedures and rules of evidence, the defendant's mental capacity and a specific advisement of the pitfalls of self-representation, the record may reflect that the defendant's waiver of counsel was knowingly, intelligently, and voluntarily made. *Id.*

### B. Adequacy of Advisement Against Self–Representation

*Dowell* set forth guidelines for establishing a "knowing, voluntary, and intelligent waiver" of the right to counsel, stating that a defendant should be advised about the following dangers and disadvantages of self-representation: (1) the defendant should know the nature of the charges against him, the possibility that there may be lesser included offenses, and the possibility of defenses and mitigating circumstances; (2) the defendant should be aware that self-representation is almost always unwise, that he may conduct a defense which is to his own detriment, that he will

receive no special treatment from the court and will have to abide by the same standards as an attorney, and that the State will be represented by experienced legal counsel; (3) the defendant should be instructed that an attorney has skills and expertise in preparing for and presenting a proper defense; and (4) the trial court should inquire into the defendant's educational background, familiarity with legal procedures and rules of evidence, and mental capacity. 557 N.E.2d at 1066–67.

Our supreme court has approved of these *guidelines,* but has held that such guidelines do not "constitute a rigid mandate setting forth specific inquiries that a trial court is required to make before determining whether a defendant's waiver of right to counsel is knowing, intelligent, and voluntary." *Leonard v. State,* 579 N.E.2d 1294, 1296 (Ind.1991). It is sufficient for the trial court to apprise the defendant of the advantages of representation by counsel and the pitfalls of self-representation. *Id.*

■ Callahan first requested that he be allowed to proceed *pro se* on the morning that his first trial was set to commence. The trial court conducted an extensive inquiry into Callahan's reasons for wishing to proceed *pro se* and his readiness to do so. R. 143–55. Specifically, the trial court asked about Callahan's education, r. 143, if he had represented himself before, r. 144, if he understood that he would be responsible for questioning witnesses and would not be getting any help from the court, and if he knew that there were rules regarding evidence. R. 147. Ultimately, the court denied Callahan's request because it was untimely. Thereafter, Callahan proceeded to trial with his counsel, a mistrial was declared, and his trial was reset.

Callahan repeatedly asserted that he wished to proceed *pro se.* Finally, one month before Callahan's second trial was

scheduled, he again appeared in court and his request to appear *pro se* was granted. The trial court referred to Callahan's previous appearance in which he had been questioned about his desire to waive the right to counsel, and asked Callahan if that was still his desire. R. 179. Callahan responded affirmatively. The trial court asked if Callahan had ever tried a case before, and Callahan stated that he had. R. 179–80. The trial court then allowed Callahan's appointed counsel to withdraw, but asked that he attend the trial as standby counsel, to which Callahan responded, "I won't need any assistance." R. 180. The trial court nonetheless insured, even over Callahan's objection, that counsel was available to him at all stages of the proceedings. At trial, Callahan himself, in his opening argument to the jury, acknowledged the dangers of representing himself:

> I've heard that there's an old saying. I'm not sure exactly how it goes.... Sometime, somewhere, someone said something to the effect that a man who represents himself has a fool for a client. Now, if you take that saying in its context, you cannot get any closer to the truth. A man who represents himself does have a fool for a client. I graciously ask that you look above the flaws in my presentation.

R. 191–92.

The record of this cause establishes that Callahan knew what he was doing when he requested to proceed *pro se* and made the choice with his eyes open.[3] The inquiry by the trial court was sufficient to fully advise Callahan of the dangers and disadvantages of self-representation.

### C. Timeliness of Advisement

■ Callahan also contends that because the advisements were given approximately two months prior to the time Callahan was actually allowed to proceed *pro se,* they were untimely and insufficient. We disagree.

---

**3.** We note that Callahan's first attempt at representing himself in this cause resulted in

a hung jury.

Callahan cites no case law for the proposition that the advisement against self-representation must be made within a certain amount of time prior to the self-representation, other than to analogize to *Miranda* cases in which it has been held that the police need not re-advise the arrestee of his *Miranda* rights if he was fully advised previously and remembered those rights. Immediately following the trial court's advisements to Callahan, the court denied his request to proceed *pro se,* not because the request was unknowing, unintelligent, or involuntary, but because it was untimely. Callahan repeatedly asserted thereafter that he wished to represent himself and ultimately was allowed to do so. Although we do not hold that the advisement must be made contemporaneously with the commencement of the self-representation, we must note that when Callahan came before the court on July 31, 1998, the trial court questioned him as to whether representing himself was still his desire. Callahan unequivocally stated that it was.

Thus, the trial court did not merely rely on its earlier inquiry, but inquired again, however cursorily, into Callahan's desire to waive his right to counsel. We see no error in this regard.

### Conclusion

We hold that Callahan voluntarily consented to the search of his vehicle and thus, the trial court did not err in denying his motion to suppress evidence seized as a result of that search. Further, the trial court properly allowed Callahan to waive his right to counsel and proceed *pro se* after advising Callahan against such conduct and finding that his waiver was knowingly, intelligently, and voluntarily made. Callahan's conviction is affirmed.

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.