**Jimmy D. CAMP, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0009–CR–585.

Court of Appeals of Indiana.

June 20, 2001.

Andrew C. Krull, Indianapolis, Indiana, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Timothy W. Beam, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellant.

## OPINION

MATTINGLY–MAY, Judge

Jimmy D. Camp brings an interlocutory appeal of the denial of his motion to suppress evidence, namely a crack pipe found in his pocket and cocaine found in his car. He raises one issue on appeal, which we expand and restate as 1) whether the police stop of Camp's vehicle was improper because it was used as a pretext to search his car for drugs, and 2) whether Camp's consent to the search of his car was invalid because the officer was "deceptive" about his reason for the stop.

We affirm.[1]

## FACTS

An Indianapolis police officer saw Jimmy Camp stop on a residential street in a high-crime area at 4:30 in the morning. A passenger in Camp's car went to a house where a woman met him, spoke to him for about twenty seconds, and appeared to

---

1. We heard oral argument at the Elkhart Circuit Court on March 2, 2001. We gratefully acknowledge the hospitality of Judge Terry C. Shewmaker, the staff of his court, and the Elkhart County bar, and we commend counsel for their capable advocacy.

give him something. The passenger returned to the car, and he and Camp drove away. The officer followed and stopped the car after Camp failed to make a complete stop at an intersection.

The officer asked Camp if he could search the car, and Camp consented. When Camp got out of the car the officer did a "pat-down" search of Camp and found a crack pipe. The officer then found cocaine on the floor of the car. Camp was charged with possession of cocaine and possession of paraphernalia.

## STANDARD OF REVIEW

■ A trial court has broad discretion in ruling on the admissibility of evidence, and on review we will disturb a trial court's ruling only upon a showing of an abuse of discretion. *Sparkman v. State*, 722 N.E.2d 1259, 1262 (Ind.Ct.App.2000). In reviewing a motion to suppress, we do not reweigh the evidence, but determine if there is substantial evidence of probative value to support the trial court's ruling. *State v. Aynes*, 715 N.E.2d 945, 949 (Ind. Ct.App.1999). We look to the totality of the circumstances and consider all uncontroverted evidence together with conflicting evidence that supports the trial court's decision. *Id.* If the basis for the ruling on a motion to suppress is unclear, we will uphold the trial court if a reasonable view of the evidence supports the trial court's decision. *Willsey v. State*, 698 N.E.2d 784, 789 (Ind.1998). We will affirm the judgment of the trial court if it is sustainable on any legal grounds apparent in the rec-

ord. *Alford v. State*, 699 N.E.2d 247, 250 (Ind.1998).

## VALIDITY OF STOP

Camp asserts the traffic stop was "a pretext for the officer to avoid Mr. Camp's constitutional protections," (Br. of Appellant at 5), and he notes the officer's testimony that he stopped Camp's car "to conduct an investigation, based on everything that I had seen, the totality of all of the circumstances." (R. at 61.) Camp concedes that "pretextual" traffic stops have been upheld by the United States Supreme Court, but he urges this court to find them improper under the independent "reasonableness" analysis applied under Ind. Const. art I § 11.

■ Camp is correct that we have, in a number of recent decisions, expressed our concern about such pretextual stops. Still, we must decline his invitation to hold that such stops are *per se* unreasonable under the Indiana Constitution. Our supreme court recently determined the Indiana Constitution does not prohibit pretextual stops, *Mitchell v. State*, 745 N.E.2d 775, 787 (Ind.2001), but noted that "[t]he potential for unreasonable search and seizure associated with such a traffic stop is not in the routine police handling of the observed traffic violation, but in the ensuing police investigatory conduct that may be excessive and unrelated to the traffic law violation." *Id.*[2]

This court also recently held with some reluctance that a lawful traffic stop, even if pretextual, is not, without more, an unrea-

2. Mitchell did not argue, and the court therefore did not address, whether the totality of the circumstances supported a reasonable suspicion that would have justified requiring Mitchell to exit the car and submit to a pat-down search. 745 N.E.2d at 787 n. 3. The court did note that neither the routine traffic stop nor Mitchell's conduct after being stopped "provided any basis justifying the officer's pat down search of Mitchell. This conclusion does not, however, reflect on the propriety of the subsequent police detention of Mitchell after finding an illegal weapon and probable drugs in the possession of Mitchell's companion." *Id.* at 782.

sonable search and seizure. *Callahan v. State,* 719 N.E.2d 430, 437 (Ind.Ct.App. 1999). In *Callahan,* a drug interdiction officer was traveling with a dog that was trained to detect drugs. The officer stopped Callahan because his car windows were improperly tinted.[3] Like Camp, Callahan gave the officer consent to search his car after the traffic stop had been concluded. We upheld the denial of Callahan's motion to suppress the drugs the officer found:

> Although we, too, are troubled by the increasingly common practice of police stopping vehicles for minor traffic offenses and seeking consent to search with no suspicion whatsoever of illegal contraband, all in the name of the war on drugs, we are unwilling under the facts of this case to say that our state constitution prohibits police from doing so. Callahan clearly and voluntarily consented to the search of his vehicle even after being told that he was free to go and that he did not have to cooperate with the officer. Thus, the State met its burden of proving an exception to the warrant requirement which rendered an otherwise unreasonable search presumably reasonable. The trial court did not err in denying Callahan's motion to suppress.

*Id.* at 439.

We share the concerns expressed by the *Callahan* panel. The officer who stopped Camp testified that he almost always asks to search cars he stops in the course of his traffic investigations in that area because of "a couple of various reasons, the location of, uh, via traffic stops, produce a lot of narcotics or handguns. Uh, just a consent to search, it's a standard procedure in all of my traffic stops." (R. at 55.) He also testified he did a "pat-down" search after

stopping Camp for the traffic violation because "I have reason to think everybody has a weapon . . . in my profession." (R. at 63) (ellipses in original).

■ Camp does not directly address the validity of the pat-down search except to assert, without explanation, that it "went beyond the scope of any consent given" (Br. of Appellant at 15) and that the crack pipe found in the pat-down search was "fruit of the poisonous tree." *Id.* at 4. Because the evidence could support a finding Camp consented to the pat-down, see, *e.g.,* R. at 63 (Q: He stepped out of the vehicle, and you said you then performed a *Terry* pat-down? A: After I explained to him that the search was voluntary, he exited the vehicle, voluntarily. I conducted a *Terry* pat.), we must decline to address the validity of the pat-down search. When an individual gives permission to a search of either his person or property, governmental intrusion thereon is presumably not unreasonable. *Jones v. State,* 655 N.E.2d 49, 54 (Ind.1995).

■ We are also troubled by this officer's statement that he felt his routine *Terry* searches are justified because "I have reason to think everybody has a weapon . . . in my profession." Under this standard, every citizen would be subject to a *Terry* search at any time solely by virtue of that citizen's interaction with the police. Because the limitations on *Terry* searches exist to protect citizens from *police intrusions* on constitutionally-protected liberties, we emphasize that a police officer cannot justify a *Terry* search simply by asserting his status as a police officer or his experience in that profession. See *Terry v. Ohio,* 392 U.S. 1, 12, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968): "Ever since its inception, the rule excluding evidence

---

3. Callahan's out-of-state license plate also appeared to have been expired. However, the officer issued a warning ticket for the window tint violation only.

seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct. Thus its major thrust is a deterrent one, and experience has taught that it is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words.'" (Citations omitted.)

Our supreme court recently invalidated a *non*-consensual pat-down search conducted in circumstances that were otherwise quite similar to those in the case before us. In *Wilson v. State*, 745 N.E.2d 789 (Ind.2001), a trooper stopped Wilson after he turned without signaling. The trooper asked Wilson to accompany him to his police car to investigate whether Wilson was intoxicated. He subjected Wilson to a pat-down search "[i]n keeping with the trooper's personal practice of patting down any person he intends to place in his car." *Id.* at 791.

The court noted that *Terry* permits a pat-down where the officer "has reason to believe that he is dealing with an armed and dangerous individual ... the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 792, *quoting Terry*, 392 U.S. at 27, 88 S.Ct. 1868. The court recognized a heightened risk of danger when an officer places a person into a patrol car that will also be occupied by the officer or other persons, *id.*, but it declined to hold that police may routinely "place traffic stop detainees in a police vehicle if this necessarily subjects the detainee to a pre-liminary pat-down frisk. An officer is not using the least intrusive means to investigate a traffic stop if, without a particularized justification making it reasonably necessary, he places a person into his patrol vehicle and thereby subjects the person to a pat-down search." *Id.* at 793.

Because there was no reasonably necessary basis for placing Wilson in the police car, the search violated the Fourth Amendment and the court therefore reversed the trial court's denial of Wilson's motion to suppress the evidence obtained therefrom.[4]

Most recently, our supreme court decided *Lockett v. State*, 747 N.E.2d 539 (Ind. 2001). Lockett was convicted of carrying a handgun without a license after police seized the gun during a routine traffic stop. This court determined evidence in the form of the gun should have been suppressed at trial on the ground that the police may not routinely question about the presence of weapons during a traffic violation stop. Our supreme court reversed and held the Fourth Amendment[5] does not prohibit police from routinely inquiring about the presence of weapons. The specific weapons inquiry was "justified by police safety concerns, and it did not materially extend the duration of the stop or the nature of the intrusion." *Id.* at 543.

The *Lockett* majority recognized, but did not address, a division among the federal circuits as to whether an officer may generally, during a traffic stop, ask questions unrelated to the stop. In his concurrence, Justice Rucker opined that the Fourth Amendment mandates that an officer have a reasonable safety concern before making

---

4. Wilson did not make an independent argument that the search was invalid under the Indiana Constitution. His case was accordingly decided on Fourth Amendment grounds.

5. Lockett did not make an independent argument under the Indiana Constitution. Lockett did not challenge the validity of the traffic stop but only the officer's inquiry regarding weapons.

a weapons inquiry: "permitting an officer to routinely inquire about the presence of weapons during a traffic stop goes beyond the scope of the circumstances which rendered its initiation permissible and furthermore does not require the officer to have an objectively reasonable suspicion that his safety is threatened." *Id.* at 544 (Rucker, J. concurring in result).

■ In the present case, Camp argues the officer had nothing more to justify the search than "inchoate suspicions or hunches" (Br. of Appellant at 12) and asserts the officer improperly conducted the search because of the neighborhood's reputation as a high-crime area. *See Swanson v. State,* 730 N.E.2d 205, 210 (Ind.Ct.App. 2000), *trans. denied* (facts that suspect had his hands in his pockets and was in a high-crime area were not sufficient to justify pat-down search). We agree, and we note that under the standards recognized in the decisions discussed above, the officer's search of Camp clearly was not justified. However, inadequacy of the officer's justification for the search is not dispositive because we find Camp consented to the search.

## VALIDITY OF CONSENT

■ When the State seeks to rely on consent to justify a warrantless search, it has the burden of proving the consent was freely and voluntarily given. *Callahan,* 719 N.E.2d at 435. Whether consent to such a search is voluntary is a question of fact to be determined from the totality of the circumstances. *Id.* The "totality of the circumstances" from which the volun-

tariness of a detainee's consent is to be determined includes, but is not limited to: (1) whether the defendant was advised of his *Miranda* rights prior to the request to search; (2) the defendant's degree of education and intelligence; (3) whether the defendant was advised of his right not to consent; (4) whether the detainee has previous encounters with law enforcement; (5) whether the officer made any express or implied claims of authority to search without consent; (6) whether the officer was engaged in any illegal action prior to the request; (7) whether the defendant was cooperative previously; and (8) whether the officer was deceptive as to his true identity or the purpose of the search. *Id.*

■ Camp argues his consent was not voluntary because the officer was deceptive as to his motives, because of illegal activity by the police prior to the search request,[6] and because his consent was "stale." We disagree.

While the *Callahan* factors address deception as to the officer's *identity* or the purpose of the *search,* Camp appears to suggest the officer was "deceptive" as to the motivation for the *stop:* "[c]oincidentally, [Officer] Fippen pulls Camp's vehicle over three blocks later for rolling through a stop sign and gets the opportunity through consent to search and investigate the vehicle just like he said he wanted." (Br. of Appellant at 14.)

In arguing the officer was "deceptive," Camp points to the officer's testimony that the officer suspected Camp's passenger had engaged in a drug transaction even

---

6. Camp does not identify or explain the "illegal activity" in which he asserts the officer was engaged. Camp also invites us to apply to the present case the following test our supreme court articulated in the context of vehicle impoundments: "a sound approach to evaluating police decisions to impound should both accommodate the multiformity of haz-

ards with which they must deal and succeed in ferreting out those impoundments which are a mere pretext for other, improper objectives." *Fair v. State,* 627 N.E.2d 427, 433 (Ind.1993). The *Fair* court noted the risk that "a decision to tow will be motivated solely by the desire to conduct an investigatory search." *Id.* We decline to so apply *Fair.*

though the officer did not see what was exchanged, and Camp's passenger and the woman at the house where Camp stopped "could have been shaking hands" or "exchanging a stick of gum." (R. at 60.) Camp also appears to assert, without explanation, that his consent was invalid because the officer conducted a pat-down search that "went beyond the scope of any consent given" (Br. of Appellant at 15) and because of the officer's "aggressive manner in effecting the stop of a vehicle he wanted to search." *Id.*

The record reflects the officer did not arrest Camp or restrain Camp's liberty in any way until after the officer discovered the crack pipe, and the State notes that the officer twice told Camp he had the right to refuse the search. The State argues the officer was not "deceptive" because nothing in the record indicates the officer tried to hide his identity or that the officer tried to hide the true purpose of his search, that is, his belief that there was contraband in the car.

■■■ As explained above, we must decline to hold that a pretextual traffic stop is *per se* improper; accordingly, a driver's consent to a search is not *per se* involuntary solely because an officer who made a valid traffic stop might have had additional motives for stopping the driver. We cannot say the trial court erred in declining to suppress evidence on the ground Camp urges, namely that the consent was involuntary because the police officer was "deceptive."

Camp's assertion that his consent was "stale" is premised on decisions from other jurisdictions that Camp characterizes as holding "voluntary consent to search a car is spoiled when the officers ask for consent to search after the reason for the stop has dissipated." *Id.* at 16. For example, in *United States v. Lee,* 73 F.3d 1034 (10th Cir.1996), a Utah police officer stopped a car carrying an African–American driver and passenger and bearing out-of-state license plates. The officer asserted he stopped the car because it was straddling the center line, and he suspected the driver might be sleepy or intoxicated. After stopping the car, running computer checks on it and on the driver and passenger, examining the car rental documents and the driver's license and passenger's identification card, and determining the driver was not impaired, the officer asked for permission to search the car. The driver gave permission, and the officer found cocaine under the seat.

The *Lee* court dealt with the stop as a *Terry* stop and determined the search was improper because an officer may not further detain or search a suspect without consent or probable cause after investigating the suspicious circumstances that give rise to the *Terry* stop. 73 F.3d at 1039. In *Lee,* the officer "lacked 'specific and articulable facts' to 'reasonably warrant' shifting the focus of his intrusion from the traffic stop to guns and drugs." *Id.* Similarly, Camp argues the purpose of his stop was accomplished when the officer served the citation for Camp's traffic violation, and the search of the car was therefore improper.

*Lee* is distinguishable. The court there found Lee's consent to the search was invalid on the ground that an encounter initiated by a traffic stop is not considered consensual unless the driver's documents have been returned to him. 73 F.3d at 1040. Because the court found a lack of consent on that basis, and not because "the officers ask[ed] for consent after the reason for the stop had dissipated," (Br. of Appellant at 16), *Lee* would appear not to apply to situations like the one before us where there is a valid consent to the search. *Lee* therefore does not require a conclusion that Camp's consent was "stale"

because the reason for the stop had dissipated.[7]

Because the officer's stop, even if pretextual, was justified by Camp's traffic violation, and because Camp's consent to the search of his car was voluntary, we cannot say the trial court erred in declining to suppress the evidence arising from the search. We accordingly affirm.

BROOK, J., and BARNES, J., concur.

7. In *Lockett,* our supreme court noted in the context of a traffic stop that such a stop must last no longer than necessary to effectuate the purpose of the stop, and that the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* at 541–542, citing *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).