**Timothy KOPKEY, Appellant–
Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 66A04–0005–CR–220.**

Court of Appeals of Indiana.

Jan. 29, 2001.

Transfer Denied April 20, 2001.

Daniel S. Tankersley, Winamac, IN, Attorney for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Adam M. Dulik, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge

### Case Summary

Timothy Kopkey appeals from a judgment revoking his in-home detention and probation and ordering his subsequent incarceration in the Pulaski County Jail to serve the remainder of his sentence. We affirm.

### Issues

Kopkey presents three issues for review, which we restate as:

I.     whether the trial court properly denied his motion to suppress the results of two urine tests, which indicated he had recently used cocaine and which formed the basis of the State's petition to revoke his in-home detention and probation;

II.     whether the trial court properly revoked his probation prospectively when the sentencing order indicated that Kopkey's actual probation would not begin until after completion of the in-home detention period; and

III.     whether the trial court possessed authority to revoke his in-home detention and order him incarcer-

ated in the Pulaski County Jail because the sentencing order itself did not clearly state that the in-home detention was either a direct placement in a community corrections program or a condition of probation.

### Facts

The State originally charged Kopkey by indictment in September 1996 with two counts of child molesting, two counts of sexual battery, two counts of criminal confinement, and one count of battery. Following plea negotiations, the State filed an amended indictment on January 12, 1998, charging Kopkey with two counts of criminal confinement as Class D felonies and two counts of battery as Class A misdemeanors. The trial court accepted Kopkey's guilty plea and sentenced him on February 19, 1998, in accordance with the plea agreement, ordering in pertinent part:

The Court, being duly advised in the premises, now sentences the defendant, Timothy Kopkey, to:

... [be] committed to the Indiana Department of Correction for a period of Three (3) years on the charge of Criminal Confinement, a Class D felony; Three (3) years on the charge of Criminal Confinement, a Class D felony; One (1) year on the charge of Battery, a Class A misdemeanor; and one (1) year on the charge of Battery, a Class A misdemeanor....

The Court also finds that:

1. The periods of incarceration shall be served consecutively in the following manner:

A. Forty-two (42) months of the sentence shall be served in the Pulaski County Jail with work release privileges.

B. Two (2) years of the sentence shall be served on electronic monitoring for In–Home Detention.

2. A sentence of [sic] two (2) years and six (6) months of the sentence shall be suspended.

3. The defendant, Timothy Kopkey, shall be placed on probation for a period of two (2) years and (6) months commencing from the date of release....

Record pp. 35–36. On May 19, 1999, the trial court corrected the sentencing order pursuant to Indiana Trial Rule 60(A), substituting "Pulaski County Jail" for "Indiana Department of Correction" in the second paragraph quoted above. We previously affirmed the trial court's action in an unpublished memorandum decision, holding that it merely rendered the entirety of the order consistent and embodied the parties' intentions. *Kopkey v. State,* No. 66A03–9910–CR–383, 725 N.E.2d 535 (Ind.Ct.App. February 29, 2000), slip op. pp. 5–6. Kopkey served twenty-one months on work release and then, based upon his two-for-one good time credit, was placed on in-home detention.

The terms of Kopkey's in-home detention and probation agreements, which were attached as exhibits to the plea agreement, provided in part that he would not possess or consume any controlled substances not prescribed by a physician. The in-home detention agreement also provided that Kopkey would submit to random testing for alcohol or illegal drug use whenever requested by a member of the Cass County In–Home Detention Department staff.[1] One such staff member visited Kopkey at his residence on November 28, 1999, and obtained a urine sample that tested positive for cocaine. Another staff member visited Kopkey on January 1, 2000, and Kopkey again produced a urine sample that tested positive for cocaine.

Based on these drug tests the State petitioned to revoke Kopkey's probation and in-home detention placement. In response, Kopkey moved to suppress the results of the urine screens. After con-

---

1. Whether this random testing provision was also part of the probation agreement is un-

clear, as that agreement is not in the record.

ducting a hearing, the trial court entered an order on February 29, 2000, denying Kopkey's motion to suppress and revoking his in-home detention placement and probation and requiring him to serve the remainder of his in-home detention and probation periods, a total of 1529 days or a little over four years, in the Pulaski County Jail. This appeal ensued.

### Analysis

#### I. Motion to Suppress

Kopkey's first contention is that the trial court erroneously denied his motion to suppress the laboratory results of the chemical analysis of the two urine samples obtained by the community corrections officers that revealed Kopkey had recently ingested cocaine. He claims that the samples were obtained at random and without reasonable suspicion in violation of his rights under the Fourth Amendment to the United States Constitution,[2] asserting that the following two provisions in his in-home detention agreement were impermissibly overbroad waivers of those rights:

> 9. ... You voluntarily waive your fourth (4th) amendment rights, and while placed on In–Home Detention you agree to submit to a search of your person, residence, motor vehicle, or any location where personal property may be found, in order to enforce the conditions of In–Home Detention pertaining to alcohol, drugs, or firearms. . . .
>
> \*   \*   \*   \*   \*   \*
>
> 14. (a) You agree to submit to random testing for alcoholic beverages or illegal drugs at any time when requested by the In–Home Detention Staff. . . .

Record pp. 31–32. A review of the record confirms there was no indication or reason to suspect Kopkey had recently used illegal drugs or alcohol at the time the two drug tests were administered.

In *Green v. State,* 719 N.E.2d 426 (Ind. Ct.App.1999), another panel of this court held that "a condition of work release that purports to require a participant to submit to a search or seizure without reasonable suspicion is overly broad." *Id.* at 430. This holding was based upon our observation in an earlier case that "[w]e ... affirm the importance of a reasonableness limitation on a probationer's consent to waive his Fourth Amendment rights in a probation agreement." *Purdy v. State,* 708 N.E.2d 20, 23 (Ind.Ct.App.1999). This statement, in turn, was based upon a separate concurrence in *Rivera v. State,* 667 N.E.2d 764 (Ind.Ct.App.1996), *trans. denied,* where the author concluded that a condition of probation requiring the probationer to submit to a search without reasonable suspicion of wrongdoing is overly broad and violates the Fourth Amendment. *Id.* at 767–68. We do not believe this analysis controls the present case.

First, we observe that the *Green* holding is based indirectly upon the *Rivera* concurrence, which was a view that did not command a majority vote in that case. Rather, the *Rivera* majority, we believe correctly, focused primarily on the probationer's voluntary consent to warrantless searches as part of his probation agreement. The published *Rivera* opinion concerned the defendant's conviction on various drug charges, but we observed in a footnote that we had recently upheld, in an unpublished opinion, the defendant's probation revocation based upon a positive drug screen. "In doing so, we rejected Rivera's claim that he had not validly waived his Fourth Amendment right to be free from drug testing. We held that, under the terms of his probation, Rivera had, in effect, agreed to submit to drug testing in order to be released from incarceration and placed on probation. *The same result obtains in the present case.*" *Rivera,* 667 N.E.2d at 766 n. 1 (emphasis added). We also stated that "[t]he record affirmatively supports the conclusion that Rivera had agreed to submit to searches as a condition of his probation in order to be released from prison." *Id.* at 767.

---

**2.** Kopkey has made no argument regarding   his rights under the Indiana Constitution.

There is no indication in the present case and Kopkey makes no claim that his consent to submit to random drug testing was procured by fraud, duress, fear, or intimidation, or was merely a submission to the supremacy of the law, which would be necessary to render such consent invalid. *See Rivera*, 667 N.E.2d at 766.

Second, we note that the work release agreement at issue in *Green* purported to waive the inmate's "4th Amendment right with regard to a search and seizure by any law enforcement officer." *Green*, 719 N.E.2d at 429. While the probation agreement in *Purdy* was not made part of the record on appeal, it also apparently contained a blanket waiver of the probationer's Fourth Amendment rights. *Purdy*, 708 N.E.2d at 23–24. Here, we focus our analysis on the more specific paragraph fourteen of Kopkey's in-home detention agreement, relating solely to random drug testing, rather than the more general paragraph nine that resembles the blanket waivers in *Green* and *Purdy*. We thus limit our holding in this case to the constitutional validity of paragraph fourteen.

■■■ Next, we believe that a distinction must be made between the "reasonableness" of a search under the Fourth Amendment and whether there was "reasonable suspicion" to support a particular search, as the two terms convey different concepts and may be improperly interchanged. "Reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, but it still requires at least a minimal level of objective justification and more than an inchoate and unparticularized suspicion or "hunch" of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123–24, 120 S.Ct. 673, 675–676, 145 L.Ed.2d 570 (2000). On the other hand, a search of a citizen may be "reasonable" under the Fourth Amendment, even when there is no individualized suspicion of wrongdoing whatsoever, because the Fourth Amendment does not necessarily require such suspicion. *See*

*Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995). This distinction is important. We agree that all government searches, whether or not conducted pursuant to a voluntary consent, must be "reasonable" and would not condone indiscriminate "ransacking" of an in-home detainee's residence at all hours, or the pumping of his or her stomach contents, for example. *Cf. Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952) (pumping of defendant's stomach "shocked the conscience" and violated Fourteenth Amendment's Due Process Clause). We do not believe there is a prohibition against conducting a search of an in-home detainee's person via urinalysis in the absence of "reasonable suspicion," notwithstanding the broad language of *Green*.

■■■ State-compelled collection and testing of urine constitutes a "search" subject to the demands of the Fourth Amendment. *Vernonia*, 515 U.S. at 652, 115 S.Ct. at 2390. The United States Supreme Court has upheld, in certain circumstances, suspicionless searches and seizures to conduct drug testing of persons or groups of persons. *See Vernonia* (public school student athletes); *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (railroad personnel involved in train accidents); *National Treasury Employees v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (federal customs officers who carry arms or are involved in drug interdiction); *but see Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (holding that statute requiring all state office candidates to submit to and pass drug test was unconstitutional). Particularized exceptions to the main rule that searches must ordinarily be based on individualized suspicion of wrongdoing are sometimes warranted based on special needs, beyond the normal need for law enforcement. *Chandler*, 520 U.S. at 313, 117 S.Ct. at 1301. When such "special

needs"—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties. *Id.* at 314, 117 S.Ct. at 1301.

■ A state's operation of a probation system presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements of the Fourth Amendment. *Griffin v. Wisconsin,* 483 U.S. 868, 873–74, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987). The in-home detention of a convicted criminal serves similar "special needs." In-home detention, like probation or incarceration, is a form of criminal punishment. *See id.* at 874, 107 S.Ct. at 3168. Like probation, in-home detention is one point "on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Id.,* at 874, 107 S.Ct. at 3169. In-home detention is likewise a conditional liberty dependent on the observance of special restrictions that are meant to assure that the detention serves as a period of genuine rehabilitation and that the community is not harmed by the detainee's having frequent contact with the public. *Id.* at 875, 107 S.Ct. at 3169. These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed.[3] *Id.*

■■ Having concluded that "special needs" existed in this case, the first factor to be considered in determining whether the suspicionless collection and testing of Kopkey's urine violated the Fourth Amendment is the nature of the privacy interest upon which the search intruded. *Vernonia,* 515 U.S. at 654, 115 S.Ct. at 2391. The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as "legitimate." *Id.* In *Griffin,* the Supreme Court stated that the supervisory relationship between a probationer and the State justifies a degree of impingement upon a probationer's privacy that would not be constitutional if applied to the public at large. 483 U.S. at 875, 107 S.Ct. at 3169.[4] We believe that the in-home detainee also has a highly reduced legitimate expectation of privacy. On the "continuum of possible punishments" mentioned by *Griffin,* in-home detention lies somewhere between incarceration and probation, where as here[5] in-home detention is through a direct commitment to community corrections as opposed to being a condition of probation. In such a situation, in-home detention is an alternative to incarceration and, but for the in-home detention, Kopkey would have been an inmate at some type of correctional facility or jail. Additionally, Kopkey's privacy expectations were greatly reduced when he voluntarily agreed to the terms of his in-home detention placement in exchange for being freed from serving time in the county jail on a work-release program. *See Vernonia,* 515 U.S. at 657, 115 S.Ct. at 2393 (holding that student athletes had a reduced privacy expectation because they voluntarily subjected themselves to a higher degree of regulation than students generally by "going out for the team"). Certainly, the privacy expectations of a person

---

3. We are concerned with the surveillance officer's practice of forwarding positive drug test results to the local law enforcement authorities, as this would contradict the non-law enforcement "special needs" justification for the tests. However, those authorities refused to take any action to prosecute Kopkey and we are thus satisfied that the random tests were not merely a subterfuge for gathering evidence of criminal wrongdoing.

4. The permissible degree of impingement is not unlimited, however. The Supreme Court held in *Griffin* that the search of the probationer's residence "was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." 483 U.S. at 880, 107 S.Ct. at 3172.

5. As we decide in part III *infra.*

convicted of a crime and sentenced to in-home detention should fall below those of a student athlete who has never been suspected of any wrongdoing whatsoever.

Next, we consider the character of the intrusion into Kopkey's privacy. *Id.* at 658, 115 S.Ct. at 2393. Although the collection of urine samples intrudes upon an excretory function traditionally shielded by great privacy, the degree of intrusion depends upon the manner in which production of the urine sample is monitored. *Id.* Unlike the student athletes in *Vernonia*, it appears that an in-home detention surveillance officer observed Kopkey as he produced urine samples, which would be a greater intrusion upon privacy interests. Still, we cannot say that this intrusion was so significant as to render the tests unconstitutional. Also unlike the student athletes, for example, Kopkey was permitted to produce the samples in the relative comfort of his own home, not in a public restroom. No other persons besides the surveillance officer observed Kopkey. Additionally, the samples were obtained during reasonable times of day; Kopkey was not roused out of bed in the middle of the night and forced to produce a sample. It also appears that the urinalysis screened only for illegal drugs and alcohol and would not reveal any other medical information regarding Kopkey's health. *See id.*

Our final consideration is the nature and immediacy of the governmental concern at issue and the efficacy of this means for meeting it. The sine qua non of illegal drugs and alcohol is that they alter mental functioning to varying degrees and have great potential to negatively impact a person's judgment. As such, the detrimental effect on an in-home detainee's rehabilitation and the increased risk to the public that may result from the use of such substances is readily apparent. Random drug testing of an in-home detainee is an effective and reasonable means to deter the use of those substances and thereby facilitate the detainee's rehabilitation and ensure public safety, particularly where as here a defendant has been convicted of violent offenses such as criminal confinement and battery. *Cf. Chandler,* 520 U.S. at 319–20, 117 S.Ct. at 1303–04 (stating that drug testing law for state office candidates was not well designed to serve stated purpose of identifying drug abusers or deterring drug users from seeking office where candidates themselves were permitted to schedule the date of the test). "[W]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable' ...." *Chandler,* 520 U.S. at 323, 117 S.Ct. at 1305. This court has previously held that a probationer may be prohibited from using illegal drugs and alcohol and that he or she may be required to undergo periodic testing to verify compliance with such a condition, regardless of whether there was any relationship between the probationer's prior criminal behavior and the use of such substances, although in that case we did not address the validity of such a requirement under the Fourth Amendment. *Carswell v. State,* 721 N.E.2d 1255, 1264–65 (Ind.Ct. App.1999). Nevertheless, *Carswell* indicates the strength of the government interest in deterring drug and alcohol use by probationers or in-home detainees for purposes of our Fourth Amendment analysis.

In sum, we have concluded that Kopkey's legitimate privacy expectations were vastly reduced in this case by his status as an in-home detainee and by his agreement to be subject to random urinalysis. The searches at issue, while they admittedly involved performing a bodily function in front of another person, were relatively unobtrusive under all the circumstances. Finally, the State has a very strong interest in deterring persons convicted of crimes and on in-home detention from taking illegal drugs or alcohol, which could severely impair their rehabilitation and/or jeopardize public safety. Thus, we hold pursuant to the Supreme Court's "special needs" analysis that a condition of in-home detention requiring the detainee to submit

to random drug and alcohol testing, without "reasonable suspicion" of wrongdoing, is still reasonable under the Fourth Amendment, as long as the manner in which the tests were carried out was reasonable, as it was here. The trial court properly denied Kopkey's motion to suppress the results of his urine drug screens.

## II. Revocation of Probation

Kopkey's second claim is that because the trial court informed him, through the sentencing order and otherwise, that his probation would follow completion of his in-home detention, the trial court erred in revoking his probation for acts that occurred before his actual probation began. Kopkey bases much of his argument on his contention that "[a]ll through the process, the law insists that a defendant know and understand his rights." Appellant's Brief p. 28. It is well-settled that the granting of a conditional liberty, which would include probation, is a favor and not a right. *Gardner v. State,* 678 N.E.2d 398, 401 (Ind.Ct.App. 1997). Thus, Kopkey's claim that he had a "right" to know that his probation could be revoked before the beginning of his actual probation must fail. Moreover, as we stated in *Gardner:*

> When a trial court grants a defendant probation in lieu of an executed sentence, the trial court is taking many aspects of the defendant's character into account. When the defendant commits a crime or violates a term of the probation, the trial court should be able to weigh that violation in its reevaluation of whether the defendant should be or should have been granted probation.... Once a defendant has been sentenced, the court may revoke or modify probation, upon a proper showing of a violation, at any time before the completion of the probationary period.

*Id.* A defendant's "probationary period" begins immediately after sentencing, even if his or her actual probation begins at a later date. *Crump v. State,* 740 N.E.2d 564, 567–68 (Ind.Ct.App.2000). Kopkey was therefore in his "probationary period" when he twice tested positive for cocaine. The trial court acted legitimately when it reevaluated Kopkey's character in light of this violation of the in-home detention and probation agreements and determined that revocation of probation was proper.

Finally, Kopkey claims that his case is different from others where we have held that probation may be revoked before actual probation has begun because the sentencing order expressly stated that probation would begin after his release from in-home detention. However, we do not see that the manner in which Kopkey was informed of his sentence differs in any material respect from the sentencing order issued in *Gardner.* There, we affirmed the revocation of the defendant's probation for conduct occurring before he began serving his sentence, even though the trial court stated that the defendant would be "placed on Probation for 270 days *following completion* of the Community Corrections Commitment." *Gardner,* 678 N.E.2d at 399. Merely because a sentencing order states that actual probation will begin after another portion of the sentence is served does not alter the fact that the "probationary period" for revocation purposes begins immediately after sentencing.

## III. Revocation of In–Home Detention

Finally, Kopkey argues that the trial court erred when it ordered him to serve the remainder of his sentence in the Pulaski County Jail after it found he had violated terms of his in-home detention agreement. He claims that "the sentencing order makes a direct commitment for two years of in-home service to the appellant's home and no other place" and, therefore, that the trial court lacked authority to order him confined to the jail. Appellant's Brief p. 11.

We agree that the sentencing order and the plea agreement upon which it was based are not entirely clear as to whether Kopkey's in-home detention was a "condi-

tion of probation" pursuant to Indiana Code Chapter 35–38–2.5, or whether it was a direct placement into a "community corrections program" pursuant to Indiana Code Chapter 35–38–2.6. The sentencing order did not explicitly state that Kopkey's sentence would be suspended while he was on in-home detention, and Indiana Code Section 35–38–2.6–3 states that a "court may, at the time of sentencing, suspend the sentence and order a person to be placed in a community corrections program...." Instead, the plea and sentencing order described Kopkey's in-home detention as a period of incarceration. This conflicts with prior statements of this court that home detention is not equivalent to incarceration. *Antcliff v. State,* 688 N.E.2d 166, 169 (Ind.Ct.App.1997).

In spite of the potentially confusing wording of the sentencing order and the main body of the plea agreement, after looking closely at the entirety of the plea agreement and sentencing order we do not accept Kopkey's assertion that the trial court lacked authority to revoke his in-home detention and place him in the Pulaski County Jail. A plea agreement is contractual in nature, binding the defendant, the State, and the trial court. *Pritscher v. State,* 675 N.E.2d 727, 732 (Ind.Ct.App. 1996). As with other contracts, courts should strive to give effect to the intentions of the parties when interpreting a plea agreement. *Wright v. State,* 700 N.E.2d 1153, 1155 (Ind.Ct.App.1998). We observe that, at the request of Kopkey's counsel, the in-home detention agreement was attached to the plea agreement as an exhibit with the explanation to the court that "[this] is designed to make clear exactly what the understanding is." Record p. 103. That agreement clearly states that Kopkey would report to the "Cass County In–Home Detention Department," not to the local probation department. Record p. 30. The agreement also provides that if Kopkey was found to be in violation of any of its provisions that he would "be immediately transported to the County Jail...."

Record p. 34. Additionally, the plea and sentencing order both refer to Kopkey's actual probation as following his in-home detention period for two years and six months, (with his sentence "suspended" for an equivalent length of time), indicating that Kopkey's home detention was not a "condition of probation." Finally, the sentencing order (as corrected) read that Kopkey was committed to the Pulaski County Jail for a total of eight years, and then indicated that the period of Kopkey's "incarceration" would be served as follows: forty-two months of work release, followed by two years of in-home detention, followed by two years and six months of a "suspended sentence" and probation.

Clearly, through the plea agreement and the wording of the resulting sentencing order, the parties intended that Kopkey's in-home detention was an "alternative" to his being held in the county jail and that his in-home detention was a direct placement in a "community corrections program" and not a condition of probation. Furthermore, we believe Kopkey plainly understood that he was subject to having his in-home detention revoked and being returned to the jail. He informed the trial court that he had gone through the terms of the in-home detention agreement "point by point, and word by word" with his attorney, and that he understood it was being attached to the plea agreement "to flush out the references to the ... conditions of in-home detention as administered both in this county and also as the Cass/Pulaski Community Corrections Program...." Record p. 104. Having accepted the benefits of his negotiated plea agreement with the state, which was made binding on him, the State, and the trial court when it was accepted, Kopkey cannot now claim to be exempt from that agreement's burdens. *See Moyer v. State,* 177 Ind.App. 461, 463, 379 N.E.2d 1036, 1038 (1978). The trial court did not err in revoking Kopkey's in-home detention and returning him to the custody of the Pulaski County Jail.

## Conclusion

The trial court properly denied Kopkey's motion to suppress the results of his drug screens because a condition of in-home detention requiring the detainee to submit to random urinalysis for purposes of drug testing without reasonable suspicion is not overly broad and does not violate the Fourth Amendment. We also hold that the trial court did not err in prospectively revoking Kopkey's probation even though he was not yet on actual probation, in spite of the wording of the sentencing order. Finally, we believe that the parties clearly intended Kopkey's service on in-home detention to be a direct commitment to a "community corrections facility" as an alternative to incarceration in the Pulaski County Jail and that Kopkey would be placed in that jail if he violated the in-home detention agreement terms.

Affirmed.

BAILEY, J., and RILEY, J., concur.