Arturo GARCIA–TORRES,
Appellant/Defendant,

v.

STATE of Indiana, Appellee/Plaintiff.

No. 64A03–0812–CR–630.

Court of Appeals of Indiana.

Sept. 30, 2009.

Transfer Granted Dec. 10, 2009.

Kurt R. Earnst, David K. Payne, Michigan City, IN, Attorneys for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Appellant/Defendant Arturo Garcia–Torres appeals from his convictions for Rape,[1] two counts of Burglary,[2] and Attempted Rape,[3] all as Class B felonies. Concluding that (1) the taking of a cheek swab for purposes of extracting a DNA profile is a search requiring reasonable suspicion, and not probable cause, under the Indiana and federal constitutions; (2) police had reasonable suspicion to take a cheek swab from Garcia–Torres; (3) the taking of a cheek swab is not subject to the advice-of-counsel requirements of *Pirtle v. State*, 263 Ind. 16, 323 N.E.2d 634 (1975); (4) the DNA evidence obtained from Garcia–Torres was not inextricably bound to his suppressed confession; and (5) the charges against Garcia–Torres were properly joined, we affirm.

1. Ind.Code § 35–42–4–1(a) (2004).

2. Ind.Code § 35–43–2–1(1) (2004).

3. Ind.Code § 35–42–4–1(a); 35–41–5–1 (2004).

## FACTS AND PROCEDURAL HISTORY

At approximately 3:00 a.m. on July 18, 2004, M.S., a twenty-one- or twenty-two-year-old student at Valparaiso University, left a friend's apartment and walked to her apartment. A few minutes after arriving home, M.S. heard a "frantic" ringing of her doorbell. Tr. p. 37. When M.S. opened the door slightly, Garcia–Torres pushed his way inside. Garcia–Torres first forced M.S. to the ground and then dragged her to the bedroom. After M.S. briefly evaded Garcia–Torres and managed to pull down a cabinet, Garcia–Torres pushed her onto the cabinet and again forced her onto the floor. Garcia–Torres placed a sock in M.S.'s cheek and had vaginal intercourse with her. When Garcia–Torres was finished, he placed a blanket over M.S., told her to go to sleep and that it would be "okay[,]" and left. Tr. p. 51. M.S. described her attacker as a Hispanic male in his mid-to-late twenties with a small amount of hair on his chin, close-cropped hair, and a thin but very muscular build. It was later determined that Garcia–Torres was the source of DNA in a sample collected from M.S.'s vagina.

Fewer than eleven months later, on June 12, 2005, and shortly before 1:27 a.m., S.P., then twenty-four or twenty-five years old and also a Valparaiso University student, was asleep in her apartment when awakened by her dog growling. S.P. heard rustling outside her window, saw a silhouette in her window, and noticed that it was open. At that point, Garcia–Torres jumped through the window and landed in S.P.'s bed. When Garcia–Torres pinned S.P. on her bed, S.P. screamed as loudly as she could. S.P.'s screams caused a neighbor to telephone the police, who arrived and knocked on the door as Garcia–Torres was attempting to remove S.P.'s underwear. When Valparaiso Police Officer Rodney McDonald announced himself, Garcia–Torres fled through the window. Pursued by other police officers, Garcia–Torres initially fled north, doubled back southbound, and was last seen running west on Union Street. S.P. described her attacker as a "Hispanic male, younger looking, approximately five six to five seven, 140 to 150 pounds, having dark hair, two to three inches in length." Tr. p. 215.

Later that morning, a mobile telephone was found on Valparaiso Street approximately four blocks due west of S.P.'s apartment building and less that one block north of Union Street. Also later that morning, S.P. found a shoe in her bedroom that did not belong to her. Police determined that the mobile telephone was in Ray Garcia's name, and, when they went to his apartment, spoke with Guillermo Torres, Garcia's roommate and an acquaintance of Garcia–Torres's. Torres told police that Garcia, a friend of Garcia–Torres's, had given his mobile telephone to Garcia–Torres and that Garcia–Torres had been using it. When shown a photograph of the shoe found in S.P.'s apartment, Torres verified that it was identical to a shoe owned by Garcia–Torres. When police spoke with Garcia, he verified that he had sold his mobile telephone to Garcia–Torres the previous month and that Garcia–Torres owned shoes like the shoe found in S.P.'s apartment. Garcia also told police where they could find Garcia–Torres, and when they did, they noticed that he matched the description given by S.P. of her attacker. Garcia–Torres's DNA was later determined to be on the shoe.

On June 13, 2005, Valparaiso police brought Garcia–Torres in for questioning. Valparaiso Police Detective John Ross questioned Garcia–Torres about the attack on S.P., followed by Valparaiso Police Detective Thomas Horn, who questioned Garcia–Torres about the rape of M.S. At the

beginning of Detective Horn's interview with Garcia–Torres, he requested and received consent to collect a DNA sample via a swab from the inside of Garcia–Torres's cheek.

During both interviews, Garcia–Torres made incriminating statements, statements that the trial court ordered suppressed on December 18, 2006.[4] On January 8, 2007, Garcia–Torres filed a second motion to suppress the results of testing done on the DNA sample collected during the interview. On May 9, 2007, the trial court denied Garcia–Torres's second motion to suppress.

On January 28, 2008, Garcia–Torres filed a motion to sever the counts against him, which motion the trial court denied on February 4, 2008. On September 30, 2008, a jury found Garcia–Torres guilty of rape, two counts of burglary, and attempted rape, all as Class B felonies. On November 14, 2008, the trial court sentenced Garcia–Torres to an aggregate sentence of thirty-six years of incarceration.

## DISCUSSION AND DECISION

### I. Suppression of DNA Test Results for Sample Obtained from Garcia–Torres

Garcia–Torres contends that the trial court abused its discretion in admitting the DNA test results of the sample obtained from him during his police interview. Garcia–Torres argues that the DNA evidence must be suppressed on three grounds: (A) police failed to obtain a valid consent before obtaining the sample in question, (B) police failed to adequately advise him of his right to counsel under *Pirtle v. State,* 263 Ind. 16, 323 N.E.2d 634 (1975), and (C) the DNA evidence was inextricably bound

to his inadmissible confessions and so must therefore also be suppressed.

"A trial court has broad discretion in ruling on the admissibility of evidence." *Barrett v. State,* 837 N.E.2d 1022, 1026 (Ind.Ct.App.2005), trans. denied. "Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion." *Id.* "An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court." *Id.* "[O]ur standard of review when reviewing a trial court's ruling on the validity of a search and seizure [is that] we consider the evidence most favorable to the ruling and any uncontradicted evidence to the contrary to determine whether there is sufficient evidence to support the ruling." *Callahan v. State,* 719 N.E.2d 430, 434 (Ind.Ct.App.1999) (citing *Melton v. State,* 705 N.E.2d 564, 566 (Ind.Ct.App. 1999)). "If the evidence is conflicting, we consider only the evidence favorable to the ruling and will affirm if the ruling is supported by substantial evidence of probative value." *Id.* (citing *Melton,* 705 N.E.2d at 566).

### A. Fourth Amendment

■ The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16

4. The suppression of Garcia–Torres's statements, made on the basis that police did not properly translate his *Miranda* rights into Spanish, is not at issue in this appeal.

L.Ed.2d 908 (1966). "In *Wolf* [*v. People of State of Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (overruled on other grounds by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)) ] we recognized '(t)he security of one's privacy against arbitrary intrusion by the police' as being 'at the core of the Fourth Amendment' and 'basic to a free society.'" *Id.*

■ Garcia–Torres notes that the taking of the DNA sample was done without a warrant and contends that his consent to the sample was not voluntary.[5] "Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure." *Callahan*, 719 N.E.2d at 434. "In cases involving a warrantless search, the State bears the burden of proving an exception to the warrant requirement." *Id.* (citing *State v. Farber*, 677 N.E.2d 1111, 1116 (Ind.Ct.App.1997)). We need not address the question of whether Garcia–Torres validly consented to the DNA swab, however, because we conclude that another exception to the warrant requirement has been established.

■ "One exception to the warrant requirement is an investigatory stop whereby a police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity may be afoot, even if the officer lacks probable cause." *Santana v. State*, 679 N.E.2d 1355, 1359 (Ind.Ct.App. 1997) (citations omitted). "In such a case the officer may briefly detain [a suspect] to conduct a limited 'non-invasive' search

such as a 'pat down' for weapons, a license and registration check, or field sobriety tests." *Snyder v. State*, 538 N.E.2d 961, 963 (Ind.Ct.App.1989), *trans. denied.*

■ After comparing cheek swabs with other searches requiring only reasonable suspicion, we conclude that the DNA sample collection technique at issue here, although minimally invasive, is also one of those limited searches that requires only reasonable suspicion and may therefore be conducted without a warrant. If anything, the cheek swab involves much less impact on the subject than some other searches that all agree may be conducted based on mere reasonable suspicion. As the United States Supreme Court has observed, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry v. Ohio*, 392 U.S. 1, 24–25, 88 S.Ct. 1868, 20 L.Ed.2d 889. And yet, it is universally understood that such a pat-down may be conducted upon reasonable suspicion.

In contrast, a cheek swab takes even less time than a pat-down or field sobriety tests ("FSTs") and is painless. Moreover, a swab of the inside of the cheek is very limited in scope, whereas a pat-down will generally involve manual exploration of the entirety of a suspect's body, including the genital areas. Finally, a swab does not carry nearly the same potential for opprobrium as pat-downs or FSTs, which will typically occur on public thoroughfares. As such, swabs are even less violative of

---

**5.** The United States Supreme Court has observed that "the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents and the subsequent search for and seizure of the evidence." *U.S. v. Dionisio*, 410 U.S. 1, 8, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (citation omitted). Garcia–Torres challenges only the collection of the DNA sample, not his seizure by police for questioning. As such, we address only the collection of the DNA sample.

the "[t]he interests in human dignity and privacy which the Fourth Amendment protects" than pat-downs or FSTs. *Schmerber,* 384 U.S. at 769–70, 86 S.Ct. 1826. If pat-downs and FSTs may be performed based upon mere reasonable suspicion, it follows, then, that cheek swabs, which are even less burdensome, may be as well.

The United States District Court for the District of South Carolina has reached the same conclusion. *See In re Shabazz,* 200 F.Supp.2d 578, 585 (D.S.C.2002). The *Shabazz* Court concluded that collection of a saliva sample by cheek swab lies somewhere between a "surgical procedure" involving a protrusion under the skin, which requires a showing of probable cause, and things such as the collection of voice samples, handwriting exemplars, and fingerprinting, which are not even searches subject to the Fourth Amendment. *Id.* at 582, 584 (citing *Schmerber,* 384 U.S. at 767, 86 S.Ct. 1826). Although the *Shabazz* Court concluded that particularized suspicion was required before a saliva swab could be administered, it also concluded that a saliva swab did not rise to the level of a "surgical procedure" under *Schmerber. Id.* at 584. It followed, then, that the existence of reasonable suspicion would suffice. *Id.*

■■■ Concluding, as we do, that a cheek swab is a search which is justified by the presence of reasonable suspicion, the only other question is whether police had reasonable suspicion in this case. Whether the officer's suspicion was reasonable is determined on a case-by-case basis by engaging in a fact-sensitive analysis of the totality of the circumstances. *State v. Belcher,* 725 N.E.2d 92, 94 (Ind.Ct. App.2000), *trans. denied.* "Law enforcement officers must have more than an inchoate and unparticularized suspicion or hunch, but need not have the level of suspicion necessary for probable cause." *Id.*

Here, we conclude that police had far more than a mere hunch that Garcia–Torres had been involved in the attack on S.P. when they collected the DNA sample. At the time, police knew that a mobile telephone belonging to Garcia–Torres had been found very near to where S.P.'s attacker had last been seen when fleeing police, that a shoe identical to shoes owned by Garcia–Torres had been found in S.P.'s apartment, and that he answered to S.P.'s general description of her attacker. The telephone and, particularly, the shoe, when one considers where they were found and that they were found soon after the attack, strongly suggest that they were left by the attacker, and both items were traced back to Garcia–Torres, who also happened to fit S.P.'s description. These objective facts, taken together, support a reasonable suspicion that Garcia–Torres was S.P.'s attacker, thereby justifying the cheek swab.

### B. *Pirtle*

■■■ Garcia–Torres contends that all DNA evidence obtained from him must be suppressed under *Pirtle,* 263 Ind. at 16, 323 N.E.2d at 634. In *Pirtle,* the Indiana Supreme Court held that "a person who is asked to give consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent." *Id.* at 29, 323 N.E.2d at 640. The Indiana Supreme Court further explained the doctrine's application in *Jones v. State,* 655 N.E.2d 49 (Ind.1995):

> A person in custody must be informed of the right to consult with counsel about the possibility of consenting to a search before a valid consent can be given.... Giving an arrestee *Miranda* warnings before commencing interrogation does not sufficiently inform him of his right to consult with counsel prior to consenting to a search.

*Id.* at 54 (citations omitted, brackets removed, and emphasis added).

Here, although Garcia–Torres was advised that he had the right to consult with an attorney before answering police questions, this advisement, as it did not refer to searches, is not adequate under *Pirtle* and its progeny. As the Indiana Supreme Court noted in *Sims v. State*, 274 Ind. 495, 413 N.E.2d 556 (1980):

> A Miranda waiver is tied to the interrogation process of the police. An advisement pursuant to that case informs the suspect about to be interrogated that he has the right to confer with counsel before answering questions and to have counsel with him during questioning. Thus, no inference would arise in the mind of the person about to be questioned from the administration of the Miranda advisement, that there is a right to confer with counsel in deciding whether to consent to a search of one's dwelling.

*Id.* at 500–01, 413 N.E.2d at 559 (*overruled on other grounds by Wright v. State*, 658 N.E.2d 563, 570 (Ind.1995)).

Moreover, there seems to us little doubt that Garcia–Torres was in custody when he was requested to give the cheek swab, as he was in the presence of two police detectives at the police station, had been advised of most of his *Miranda* rights, and had already admitted to his role in the attack on S.P. *See Ackerman v. State*, 774 N.E.2d 970 (Ind.Ct.App.2002) (concluding that defendant was in custody after she had been transported away from her home by police; admitted to drinking, driving, and leaving the scene of an accident; and had been *Mirandized*), *trans denied*. There is, however, an initial inquiry, which is whether the *Pirtle* doctrine even applies to cheek swabs.

 We conclude that *Pirtle* cannot apply to the instant case, as such an application would serve none of the principles undergirding that decision and lead to an unsound result. We have already concluded in our Fourth Amendment analysis that cheek swabs are searches requiring only reasonable suspicion, and we reach the same conclusion under Section 11. Under the federal reasonableness test for gathering of physical samples, the "extent to which the procedure may threaten the safety or health of the individual" and the "extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity" should be "[w]eighed against ... the community's interest in fairly and accurately determining guilt or innocence." *Winston v. Lee*, 470 U.S. 753, 761–62, 105 S.Ct. 1611, 84 L.Ed.2d 662. This test tracks to a large extent the Section 11 test that requires us to consider, in part, "the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and ... the extent of law enforcement needs."[6] *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005). While we believe that a cheek swab is intrusive enough that some level of particularized suspicion is required, we do not believe that it is so intrusive as to require probable cause. Given the very low degree of intrusion of a cheek swab and the extremely compelling law enforcement needs, we conclude that the proper balance is struck by requiring reasonable suspicion. Cf. *Ackerman*, 774 N.E.2d at 981 (noting that probable cause is not required to administer FSTs under Article I, Section 11), *trans. denied.*

---

**6.** The first factor in this test, "the degree of concern, suspicion, or knowledge that a violation has occurred," seems to go to the question of whether a particular search was justified in a particular case, not what level of justification is required for a particular type of search. *Litchfield*, 824 N.E.2d at 361.

Moreover, just as it is under the Fourth Amendment, reasonable suspicion is a recognized exception to the warrant requirement under Article I, Section 11, *See, e.g., Campos v. State,* 885 N.E.2d 590, 597, and here police had ample reasonable suspicion that Garcia–Torres had committed a crime. The significance of this, of course, is that once police had established reasonable suspicion to conduct the cheek swab, the search was already fully justified under Section 11—*with or without Garcia–Torres's consent and without need for a search warrant.* Because consultation with an attorney regarding your rights to refuse consent and the various requirements for a search warrant can do you no good when you cannot refuse consent and the State does not need to obtain a search warrant, *Pirtle*'s advisement requirement simply has no place in the context of a reasonable suspicion search. It makes little sense to punish the police for failing to give an advisement of one's right to counsel when exercise of that right could only produce such a futile consultation.

Strict application of *Pirtle* under the circumstances of this case would lead to the following unsound and unjust conclusion: the results of the DNA test would have to be suppressed because police (1) needlessly asked Garcia–Torres for consent to a search and (2) failed to give him a futile advisement of his right to counsel. We doubt that this result, which would effectively punish the State for doing *more* than constitutionally required of them, could have been intended by the *Pirtle*

Court.[7] We decline to apply *Pirtle* in such a way as to punish the failure to advise a subject that he has the right to consult with counsel when the consultation can do him no good, at least in the context of a cheek swab. Consequently, the DNA test results are not rendered inadmissible on the basis that Garcia–Torres was not advised of his right to counsel before consenting to the cheek swab. *Cf. Ackerman,* 774 N.E.2d at 982 (concluding that the *Pirtle* doctrine did not apply to FSTs and so failure to advise of right to counsel did not require suppression of test results).

## C. Whether the DNA Evidence was Inextricably Bound to the Suppressed Confessions

 Finally, Garcia–Torres contends that the DNA evidence linking him to the two assaults must be suppressed because it is inextricably linked to his suppressed confession.

> When a confession is suppressed because it was unlawfully obtained, evidence which is inextricably bound to the confession will also be suppressed upon proper objection, *Dowlut v. State,* (1968) 250 Ind. 86, 255 [235] N.E.2d 173, unless it is shown that the evidence was discovered by some means independent of the illegal confession, *Watts v. State,* (1950) 229 Ind. 80, 95 N.E.2d 570.

*Hall v. State,* 264 Ind. 448, 449, 346 N.E.2d 584, 588 (1976).

It is true that the request for consent to the cheek swab came after Garcia–Torres had made incriminating statements regarding the assault on S.P. the day before.

---

**7.** Another example of the dangers of strictly applying *Pirtle* is in the context of a search incident to arrest, another well-established exception to the warrant requirement. *See, e.g., Wilson v. State,* 754 N.E.2d 950, 956 (Ind.Ct. App.2001). Such searches are always conducted when the suspect is in custody, so *Pirtle,* if applied as written, will always apply to them. As with cheek swabs, however, searches incident to arrest are searches for which no consent is required. If police do not ask for consent, any evidence found in the search is admissible. On the other hand, should the police ask for consent without giving *Pirtle* advisements, a strict reading of the case would require suppression, clearly an unsound result.

Detective Horn, however, testified that, based on the similarities and locations of the crimes and the physical descriptions given by the victims, Garcia–Torres was already a prime suspect prior to his confession to Detective Ross and he would have requested the cheek swab in any event. (April 5, 2007, Supp. Hearing Tr. 47). The trial court was entitled to believe this testimony, which establishes that the DNA evidence was obtained by means independent from the suppressed confession.

### D. Summary

In summary, we conclude that the collection of cheek swabs was justified under the Fourth Amendment by the existence of reasonable suspicion, the Pirtle doctrine does not require suppression of the DNA test results, and the DNA test results are not inextricably linked to Garcia–Torres's suppressed confession. As such, the trial court did not abuse its discretion in admitting the results of the DNA testing on material obtained from the cheek swab.

### II. Severance of Charges

■ Garcia–Torres contends that the trial court erred in allowing the charges arising from the incident with S.P. to be joined with the charges arising from the incident with M.S. Garcia–Torres contends that the charges were joined solely because they are of the same or similar character. Indiana Code section 35–34–1–9(a) provides that

> [t]wo (2) or more offenses may be joined in the same indictment or information, with each offense stated in a separate count, when the offenses:
>
> > (1) are of the same or similar character, even if not part of a single scheme or plan; or
> >
> > (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

Indiana Code section 35–34–1–11(a) provides that

> Whenever two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses. In all other cases the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:
>
> > (1) the number of offenses charged;
> >
> > (2) the complexity of the evidence to be offered; and
> >
> > (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

■ "[S]everance of offenses as a matter of right [is required] under subsection 11(a) only when the offenses are joined *solely* because of the reason listed in subsection 9(a)(1), i.e., that the offenses are of the same or similar character." *Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1145 (Ind. 1997) (citing *Brown v. State*, 650 N.E.2d 304, 305 (Ind.1995)). "However, when the offenses are joined under subsection 9(a)(2), the court must grant a severance only if it determines that it is 'appropriate to promote a fair determination of the defendant's guilt or innocence,' based on subsections 11(a)(1) through (3)." *Id.* (citing *Conner v. State*, 580 N.E.2d 214, 219 (Ind.1991)).

■ Garcia–Torres contends that the various charges were joined solely on the basis that they are of the same or similar character and that he is therefore entitled to severance as of right. We cannot agree

that Garcia–Torres was entitled to severance as of right. It is well-established that "[u]nder subsection 9(a)(2), offenses may be sufficiently 'connected together' to justify joinder if the State can establish that a common *modus operandi* linked the crimes and that the same motive induced that criminal behavior." *Id. Modus operandi* means literally "method of working" and refers to a pattern of criminal behavior so distinctive that separate crimes may be recognized as the work of the same wrongdoer. *Wilkerson v. State,* 728 N.E.2d 239, 246 (Ind.Ct.App.2000). With respect to *modus operandi,* the Indiana Supreme Court has said that

> the inquiry must be, "Are these crimes so strikingly similar that one can say with reasonable certainty that one and the same person committed them?" Not only must the methodology of the two crimes be strikingly similar, but the method must be unique in ways which attribute the crimes to one person.

*Penley v. State,* 506 N.E.2d 806, 810 (Ind. 1987) (discussing *modus operandi* in an evidentiary context).

Evidence of *modus operandi,* of course, is not an end but, rather, a means, whose only real purpose is to establish that two or more crimes were committed by the same person, and it is apparent to us that evidence other than traditional evidence of *modus operandi,* such as DNA, may accomplish this purpose.

Typically, it will be an accumulation of small details that will mark several crimes as the handiwork of one person, such as commonality of place, motive, appearance of victim, etc. On other occasions, however, one unique characteristic will suffice to provide a "signature." The Texas Court of Criminal Appeals has offered the following illustration of this so-called "mark of Zorro" mode of establishing identity:

> For example, suppose that three bank robberies are committed over a four-year period in different cities in which the robber used an antique silver crossbow. This scenario is so unusual that it is highly likely that each robbery was committed by the same person using the same antique silver crossbow. This is "the mark of Zorro" mode of proving identity; it is a remarkably unusual fact, in which a single detail suffices to establish identity.

*Segundo v. State,* 270 S.W.3d 79, 88 (Tex. Crim.App.2008).

With this in mind, another (and perhaps more accurate) way to formulate the question posed in *Penley* is: Does the evidence regarding these crimes establish a "signature" such that one can say with reasonable certainty that they were committed by the same person? Here, the answer to that question is "yes." Both cases, which occurred within eleven months of one another, involved a home invasion and the attacker spoke English in a Spanish accent and fit the same general physical description. (Tr. 54, 81, 167, 215, 237). Both victims were female Valparaiso students in their early twenties who lived within a half mile of each other. (Tr. 31–32, 89, 156–57, 170, 213, 242). The totality of the evidence described above, along with the DNA recovered from M.S.'s vagina that matched that recovered from the shoe found in S.P.'s room, allows one to say with certainty that the two crimes were committed by the same person. As such, the two series of crimes are "connected together" for purposes of Indiana Code section 35–34–1–9(a)(2) and were not joined simply because they were of the same or similar character. *See Segundo,* 270 S.W.3d at 89 (in evidentiary context, concluding that "DNA found in both murder victims matched appellant's DNA profile—it is as if appellant left his calling card in both [victims.]").

■ The next question, then, is whether the trial court abused its discretion in joining the charges considering the number of offenses charged, the complexity of the evidence to be offered, and whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense. Ind.Code § 35–34–1–11(a). Here, Garcia–Torres does not argue that the considerations above indicate an abuse of discretion on the part of the trial court, and we see no such indication in the record. Because the State charged Garcia–Torres with only four crimes and none of the evidence strikes us as particularly complex, there would seem to have been little chance of jury confusion. Garcia–Torres has failed to establish that the trial court abused its discretion in declining to sever the charges against him.

### Conclusion

On the question of whether the trial court abused its discretion in admitting evidence generated by the cheek swab performed on Garcia–Torres, we conclude that was justified under the Fourth Amendment by the existence of reasonable suspicion. We further conclude that cheek swabs performed for the purpose of obtaining a DNA sample, while searches under Article I, Section 11, of the Indiana Constitution, are not subject to the advice requirements of *Pirtle*. Finally, we conclude that the DNA evidence was not inextricably bound to Garcia–Torres's confessions that were suppressed on other grounds. The trial court, therefore, did not abuse its discretion in admitting evidence related to the DNA profile obtained through the cheek swab.

On the question of whether the trial court correctly allowed the State to join all of the charges against Garcia–Torres, we conclude first that the charges were not joined solely on the basis that they were of the same or similar character. The totality of the evidence regarding the manner in which the crimes were committed, along with the discovery of Garcia–Torres's DNA at both scenes, constitutes a signature sufficient to establish a "series of acts connected together" for purposes of Indiana Code section 35–34–1–9(a). Moreover, we conclude that Garcia–Torres has failed to establish that the trial court abused its discretion in declining to sever the charges against him.

The judgment of the trial court is affirmed.

BROWN, J., concurs.

CRONE, J., dissents with opinion.

CRONE, Judge, dissenting.

I believe that the taking of a cheek swab from a custodial suspect for purposes of extracting a DNA profile is a search requiring probable cause under the Fourth Amendment and is subject to the advice-of-counsel requirements of *Pirtle*. As such, I conclude that the trial court committed reversible error in admitting the DNA evidence obtained from Garcia–Torres's cheek swab in this case. Also, I believe that Garcia–Torres was entitled to severance of the charges against him as a matter of right. Therefore, I respectfully dissent.

To reiterate, the U.S. Supreme Court stated in *Schmerber* that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." 384 U.S. at 767, 86 S.Ct. 1826. "[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Ex-*

*ecutives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (citation and quotation marks omitted). " 'Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant [and] ... the showing of probable cause required by the Warrant Clause.' " *Shabazz*, 200 F.Supp.2d at 583 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)) (alterations in *Shabazz* ). "However, under certain circumstances, searches and seizures may be permissible under the Fourth Amendment 'based on suspicions that, although "reasonable," do not rise to the level of probable cause.' " *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)).

In *Shabazz*, upon which the majority relies in concluding that a cheek swab may be conducted upon reasonable suspicion, the District Court of South Carolina denied the appellant's motion to quash a subpoena requiring her to "provide an oral sample of her saliva for DNA testing." *Id.* at 580.[8] The analysis reads in pertinent part as follows:

> [Appellant] argues that *"Schmerber* and its progeny" require a showing of "probable cause" because the saliva sample is an "invasive procedure." In *Schmerber*, the Supreme Court held that a police blood test for the purpose of determining a suspected drunken driver's alcohol content was "reasonable" because the evidence of alcohol in the blood would disappear during the time necessary to obtain a search warrant. 384 U.S. at 770–71, 86 S.Ct. 1826[, 16 L.Ed.2d 908]. Although the Court upheld the warrantless search, it noted the

existence of probable cause. *See id.* at 770, 86 S.Ct. 1826[, 16 L.Ed.2d 908]. The Court explained that "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." *Id.* at 769–70, 86 S.Ct. 1826[, 16 L.Ed.2d 908]. Accordingly, the Court reasoned that "search warrants are ordinarily required ... where intrusions into the human body are concerned." *Id.* In *Winston v. Lee*, 470 U.S. at 753, 105 S.Ct. 1611[, 84 L.Ed.2d 662], the Court held that a state court order directing Lee, who had been arrested and charged with robbery, to undergo surgery to remove the bullet lodged under his left collarbone was an "unreasonable" search under the Fourth Amendment. The Court explained that although "the reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interest in privacy and security are weighed against society's interests in conducting the procedure," the "threshold requirement" was the existence of probable cause. *Id.* at 760, 105 S.Ct. 1611[, 84 L.Ed.2d 662].

> This case, however, is distinguishable from *Schmerber* and *Winston* on two grounds. Most important, neither of those cases involved a grand jury subpoena; therefore the grand jury's exemption from the "probable cause" standard was not applicable. Moreover, the privacy concerns that led the Court to require probable cause in those cases are not as pronounced in this case because a saliva swab is not as intrusive as a blood test or a surgical bullet-removal procedure. The Court in *Winston* de-

---

8. Shabazz was "under investigation by the F.B.I. for allegedly engaging in sexual relations with inmates and for extortion related to this misconduct." *Shabazz,* 200 F.Supp.2d at 580.

scribed the *Schmerber* test as applicable to "surgical intrusions beneath the skin." 470 U.S. at 760, 105 S.Ct. 1611[, 84 L.Ed.2d 662]. Although the saliva swab involves a slight invasion of a person's bodily integrity, it is not a "surgical procedure" and therefore does not fall within *Schmerber*'s threshold requirement of probable cause. *Id.* Thus, no showing of probable cause is needed before the grand jury may issue a subpoena duces tecum requiring Petitioner to submit a saliva sample.

*Id.* at 583–84 (citation omitted).

While it may be true, as the *Shabazz* court stated, that a cheek swab involves only "a slight invasion of a person's bodily integrity," the intrusiveness of the search procedure is not dispositive of whether the search is reasonable. Under the Fourth Amendment, we must also consider "the nature of the privacy interest upon which the search intruded." *Kopkey v. State,* 743 N.E.2d 331, 337 (Ind.Ct.App.2001) (citing *Vernonia,* 515 U.S. at 654, 115 S.Ct. 2386), *trans. denied.* It is difficult to imagine a more intrusive invasion of an individual's personal privacy than a DNA search, and the potential consequences of such a search are much more significant than the majority suggests. Whereas a field sobriety test reveals only whether a driver currently is intoxicated, and a pat-down search reveals only whether a suspect currently is armed or possesses contraband,[9] a cheek swab may reveal not only whether the suspect has committed the crime at issue, but also whether he has committed other crimes for which DNA evidence has been collected. Moreover, a cheek swab may reveal legally significant information regarding paternity or maternity, as well as information regarding genetically influenced diseases, conditions, and behaviors, none of which are relevant to a law enforcement purpose. Under these circumstances, I believe that a cheek swab of a custodial suspect is reasonable under the Fourth Amendment only if probable cause exists to conduct such a search.[10] *Cf. Balding v. State,* 812 N.E.2d 169, 173–74 (Ind.Ct.App.2004) (holding that compulsory cheek swab of incarcerated convicted offender for inclusion in state DNA database was reasonable search under Fourth Amendment, in that offender "possessed a reduced expectation of privacy and the character of intrusion … was minimal, and … the State's interest was substantial in creating a DNA database").

Assuming for argument's sake that probable cause existed to conduct the search in this case, the search was unreasonable because the police did not obtain a warrant.[11] *See VanPelt v. State,* 760

---

**9.** *See Burkett v. State,* 785 N.E.2d 276, 278 (Ind.Ct.App.2003) ("The seizure of contraband detected during a *Terry* search for weapons is permissible under the 'plain feel doctrine.' If during the lawful patdown of the suspect's outer clothing, the officer feels an object whose contour or mass makes its identity as contraband immediately apparent to that officer, a warrantless seizure may be executed.") (citations and some quotation marks omitted).

**10.** Garcia–Torres does not raise a state constitutional argument. Nevertheless, I believe that probable cause also would be required under Article 1, Section 11 of the Indiana Constitution.

**11.** Unlike a person's blood alcohol level, which "diminish[es] shortly after drinking stops," *Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826, "DNA does not change throughout the life span of a person." Tr. at 331 (testimony of Indiana State Police forensic biologist Leslie Harmon). Thus, the exigent circumstances exception to the warrant requirement may arise less frequently in cases involving cheek swabs. *See, e.g., Frensemeier v. State,* 849 N.E.2d 157, 161 (Ind.Ct.App.2006) ("One well-recognized exception to the warrant requirement is when police have probable cause

N.E.2d 218, 221 (Ind.Ct.App.2001) ("Searches and seizures that occur without prior judicial authorization in the form of a warrant are per se unreasonable, unless an exception to the warrant requirement applies."), *trans. denied* (2002). The State contends that no warrant was necessary because Garcia–Torres voluntarily consented to the search. I disagree.

Warrant considerations aside, I agree with the majority that there is "little doubt that Garcia–Torres was in custody when he was requested to give the cheek swab[.]" Op. at 275. As such, Garcia–Torres was entitled to be "be informed of the right to consult with counsel about the possibility of consenting to such a search" pursuant to *Pirtle*. *Jones*, 655 N.E.2d at 54. He was not. It is worth noting that *Pirtle* and the ensuing Indiana Supreme Court cases that mention *Pirtle* do not distinguish between searches requiring probable cause and searches requiring only reasonable suspicion. If our supreme court wants to carve out an exception to the rule it announced in *Pirtle*, that is its prerogative, not ours.

In sum, the trial court erred in admitting the DNA test results obtained as a result of the cheek swab. The State contends that any such error was harmless. Again, I disagree. Consequently, I would reverse Garcia–Torres's convictions and remand for a new trial.[12] *See Hirshey v. State*, 852 N.E.2d 1008, 1014 (Ind.Ct.App. 2006) ("Retrial following reversal for im-

properly admitted evidence does not violate the Double Jeopardy Clause so long as all the evidence, even that erroneously admitted, is sufficient to support the jury verdict.") (citation and quotation marks omitted), *trans. denied.*

On remand, Garcia–Torres should be entitled to severance of the charges against him as a matter of right pursuant to Indiana Code Section 35–34–1–11(a).[13] To me, it is patently obvious that the offenses were joined solely on the basis that they are of the same or similar character. I do not believe that the State established that a common modus operandi linked the two assaults. Unlike in *Segundo*, 270 S.W.3d 79, upon which the majority relies, the DNA evidence in this case was not recovered from both victims' sexual organs. The DNA evidence from the second assault was recovered from a shoe, which also contained DNA from someone other than Garcia–Torres. See Tr. at 358–68 (testimony of Indiana State Police forensic biologist Leslie Harmon). Moreover, the perpetrator of the first assault rang the victim's doorbell to gain entry to her home, whereas the perpetrator of the second assault—which occurred nearly one year later—climbed through the victim's bedroom window. As for the fact that both victims were young female students who lived within half a mile of each other, this commonality is hardly surprising given that the assaults were committed in a relatively small college town.

for the search and exigent circumstances exist rendering obtaining a warrant impractical. One such exigent circumstance that justifies a warrantless search occurs when incriminating evidence is in jeopardy of being destroyed or removed unless immediate action is taken.") (footnote and citation omitted), *trans. denied.*

12. I agree with the majority that the DNA evidence was not inextricably bound to Garcia–Torres's suppressed confession.

13. In my view, the issue raised on appeal is more properly framed as whether the trial court abused its discretion in denying Garcia–Torres's motion to sever the charges, rather than whether "the charges against Garcia–Torres were properly joined[,]" as the majority states. Op. at 270.

More fundamentally, I believe that it is illogical to argue that because the DNA evidence suggests that Garcia–Torres committed both assaults, the methodology of the crimes is so strikingly similar that one can say with a reasonable certainty that the same person committed them. Such an approach stands the modus operandi inquiry on its head and results in the exception consuming the rule.[14]

For the foregoing reasons, I respectfully dissent.

---

**14.** Unlike the antique silver crossbow mentioned in *Segundo*, DNA is not evidence of a distinctive "method of working" that tends to establish identity, but rather evidence of identity per se—that is, an end, rather than a means.